IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL L. ROSS,** | : | |
| | : | **Case No. 2:14-CV-02724** |
| **Plaintiff,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | **Magistrate Judge Terence P. Kemp** |
| **CITY OF DUBLIN, OHIO,** | : | |
| **STREETS AND UTILITIES** | : | |
| **DEPARTMENT** | : | |
| | : | |
| **Defendant.** | : | |

## OPINION & ORDER

This matter is before the Court on four motions: (1) the Motion for Summary Judgment of Defendant City of Dublin (the "City", or "Dublin") (Doc. 19); (2) Plaintiff Michael L. Ross's ("Mr. Ross" or "Ross") unopposed motion to amend its opposition to Dublin's motion for summary judgment (Doc. 28); (3) Defendant's Motion to Strike the Declaration of Plaintiff (Doc. 30); and (4) Plaintiff's Motion for Leave to File Substitute/Corrected Declaration.  (Doc. 32.)  For the following reasons, the Court **DENIES** Defendant's motion for summary judgment on Plaintiff's race discrimination and constructive discharge claims (Doc. 19), **GRANTS** Plaintiff's unopposed motion to amend its opposition brief (Doc. 28), **GRANTS in part** Defendant's motion to strike (Doc. 30) and **GRANTS** Plaintiff's motion for leave to file substitute/corrected declaration.  (Doc. 32.)

## I.    BACKGROUND

This case arises from the alleged race discrimination of the City of Dublin against Plaintiff, a former employee.  Plaintiff alleges that Defendant discriminated on the basis of race when it disciplined him with a ten-day suspension.  Plaintiff also alleges that Dublin constructively discharged Plaintiff.

1

## A.  Factual History

### 1.  Early Employment

Mr. Ross began his employment at the City of Dublin in 2002 as a maintenance worker following an interview with then-director of Streets and Utilities, Daniel Johnson.  (Ross Dep., Doc. 19-10, at 22, 24-25.)  In 2003 and 2004, Ross heard two City employees use racial epithets in front of, or to, Mr. Ross.  (*Id.* at 47-48.)  Ross reported each, contemporaneously, to John Babyak or William Grubaugh, the two City Operations Administrators.  (*Id.*)  To Ross's knowledge, nothing was done following the incidents.  (*Id.*)

In 2008, then-director of Streets and Utilities, Ronald Burns, promoted Ross to Crew Supervisor.  (*Id.* at 25.)  As a Crew Supervisor, Mr. Ross supervised up to seven City employees and reported to Mr. Babyak.  (*Id.* at 80.)  During this time period, seasonal workers for the City complained that several maintenance workers used racial epithets in the workplace.  (Miglietti Aff't, Doc. 19-1, at ¶ 6.)  After investigating the allegations, the City found just cause to discharge five employees.  (*Id.* at ¶ 7.)  The City fired four; one resigned voluntarily.  (*Id.* at ¶ 8.)  Of the four terminated, the City reinstated three following arbitrations over their terminations.  (*Id.* at ¶ 10.)

During this time, the City heard additional allegations that led to the termination or discipline of two other employees, (*id.* at ¶ 11), and Ross received a racially-charged, threatening letter in his home mailbox.  (Ross Dep. at 16, 46, 109-110.)  Neither the letter nor the envelope contained distinguishing characteristics, but Ross believed the letter to stem from his employment with Dublin.  (*Id.*)  Ross turned the letter over to Dublin's attorneys and the arbitrator in the case.  (*Id.* at 52.)  Ross could not discern any distinguishing marks on the letter, and he did not file a police report.  (*Id.* at 109-110.)  There was tension in the workplace after

Dublin reinstated the previously discharged employees, but Ross did not complain about their actions after reinstatement.  (Miglietti Aff't, Doc. 19-1, at ¶¶ 15, 16.)

Over the course of his employment with the City, Ross received positive annual performance evaluations.  These performance evaluations contained messages like "Congratulations on another fine year!!"; "You have done a great job in all respects"; and "you are a valuable employee with a tremendous amount of skills and knowledge!"  (Performance Appraisals, Doc. 29-1, at 6, 30, 43.)  Aside from the suspension at issue in this case, the City did not discipline Plaintiff.  (Ross Decl. at ¶ 11.)

In March of 2012, Plaintiff reported potential issues with City maintenance worker Luke Browning's sick leave to his supervisor, John Babyak.  (Burns Dep., Doc. 19-7, at 28.)  Luke Browning was a white subordinate of Mr. Ross.

### 2.   *Policy Violation Allegations and Investigation against Plaintiff*

The City has a policy that prohibits employees from using City vehicles for personal use, except as authorized.  (Ross Dep. at 103; Ex. L to Ross Dep., Doc. 19-11, at 49; Burns Dep. at 33-34.)  Even when authorized, personal use must be *de minimus*, which Mr. Burns defines to mean stopping somewhere en route to a legitimate destination, or approved use in an emergency.  (Burns Dep. at 32; Ex. L to Ross Dep.)  Mr. Ross had to sign off on the policy before he could use a City vehicle.  (Burns Dep. at 34.)

In early summer 2012, Luke Browning told John Babyak that Plaintiff "frequently" drove a City vehicle home during work hours.  (*Id.* at 14-15.)  Mr. Ross lived approximately three miles from the office.  (Ross Decl., ¶ 12.)  Mr. Babyak brought the issue to the attention of Mr. Burns, who asked to clarify whether Luke Browning alleged that Plaintiff "frequently" (rather than occasionally) took a City vehicle home during working hours.  (Burns Dep. at 15.)  Mr. Babyak responded in the affirmative.  (*Id.*)  Mr. Burns then told Mr. Babyak to "watch Mike

3

[Ross] for awhile and see if he really is frequently doing this." (*Id.* at 15.) Mr. Babyak "watched" Plaintiff by asking Luke Browning to tell him the next time Plaintiff took the City vehicle home during work hours. (*Id.*) Luke Browning knew when Mr. Ross was going home because Mr. Ross would announce his intention to go home in his morning crew leader meetings. (*Id.* at 23; Ross Decl. at ¶ 13.) In May and June of 2012, Luke Browning twice reported Mr. Ross's conduct to Mr. Babyak, who drove to Plaintiff's house and took pictures of the City vehicle in the driveway. (Burns Dep. at 44-48.) Mr. Babyak, in turn, reported these incidents to Mr. Burns. (*Id.* at 18-19.) On June 14, 2012, Plaintiff drove a City vehicle home for the third time in the four-to-six weeks Mr. Babyak had been "watching" him. (*Id.* at 52-53.) This time, Luke Browning accompanied Plaintiff to his home to address, briefly,[1] an issue with Plaintiff's pool. (*Id.* at 53; Ross Decl. at ¶¶ 20, 23.)

After the third incident, the City initiated a formal investigation. Mr. Burns conducted the investigation in consultation with Human Resources Director David Harding and Deputy City Manager Dana McDaniel. (Burns Dep. at 21-22, 55, 63.) Mr. Burns interviewed several employees, including Luke Browning and Plaintiff. (*Id.* at 88.) During Luke Browning's interview, Mr. Browning told Mr. Burns that, in addition to the three incidents mentioned above, Plaintiff had driven a City vehicle during working hours to a vendor in Worthington to purchase a roll of fence for his personal use. (*Id.* at 57-58, 60.) Mr. Burns questioned Plaintiff about Luke Browning's allegations. Plaintiff admitted to taking a City vehicle home to retrieve things he had forgotten, like his phone or medication, which he estimated to occur approximately once every couple of weeks. (Ross Dep. at 88.) Plaintiff denied taking Luke Browning to his home to "work" on his pool (Ross Dep. at 78-80; Burns Dep., at 52-53, 78-80, 101; Ross Decl. at ¶ 23),

---

[1] The parties dispute just how briefly.

and denied being home for more than a minute or two at any time. (Burns Dep. at 101; Ross Decl. at ¶¶ 13, 20, 23.)  Regarding the fence purchase, Plaintiff claimed that he and Luke Browning detoured briefly from City business in Worthington to pick up the fencing, but that they took it back to his car at the City rather than taking it home.  (Burns Dep. at 78-80; Ross Decl. at ¶ 25.)

Mr. Burns did not believe Mr. Ross, in part because Mr. Burns knew that Luke Browning had gone to Mr. Ross's home to answer a question regarding Mr. Ross's pool, because Mr. Burns did not think it possible to diagnose a problem with a pool in just a few minutes as the story was told by Ross, and because it would not have been a "daily thing" for a Crew Supervisor to take a maintenance worker on a shopping trip in Worthington.  (Burns Dep. at 78-80, 101.)  A re-interview with Luke Browning cemented Mr. Burns' assessment.  (*Id.* at 78-81.)

### 3.  Discipline and Appeal

On July 12, 2012, Mr. Burns held a pre-disciplinary conference with Mr. Ross, where he advised Mr. Ross of the "charges" against him and provided Mr. Ross with an opportunity to explain himself.  (Ex. 2 to Miglietti Aff't, Doc. 19-1, at 7-8.)  Following that conference, Mr. Burns decided to suspend Mr. Ross from work without pay for ten days (Ex. 4 to Miglietti Aff't, Doc. 19-1, at 30) based on the findings that:

> Mr. Ross has engaged in serious misconduct which includes untruthfulness and making false statements during his investigatory interviews, misuse of a City vehicle and City time, misuse of his authority over a crew member, being absent without permission when purchasing fence, going home during work time to pick up his wallet, phone, medicine, etc. . . . and taking a crew member home during work time to make repairs to his pool.

(*Id.*)  Mr. Burns determined that Mr. Ross could substitute forty hours of paid vacation time for one week of his suspension.  (*Id.*)

5

Plaintiff appealed Mr. Burns' findings to Deputy City Manager McDaniel, stating in a July 24, 2012 email: "I was disciplined, I believe too harshly. . . .  I believe that the discipline, given my work history and personal file was very extreme and discriminatory, seeing as we have members of this management team that have done seemingly far worse and have received a far less action."  (Ex. I to Ross Dep., Doc. 19-11, at 43.)  Mr. McDaniel met with Mr. Ross and Mr. Burns on August 8, 2012 to conduct the appeal.  (Ex. J to Ross Dep., Doc. 19-11, at 44.)  During this meeting, Mr. Ross admitted to purchasing fencing material for his personal use during working hours.  (Ross Dep. at 89.)  Mr. Ross also admitted to having used a City vehicle to take Luke Browning to his home to look at his pool.  (*Id.* at 88-89.)  Mr. McDaniel dismissed certain charges, including the charge that Mr. Ross went home in a City vehicle during work hours to retrieve personal items, but he upheld the ten-day suspension.  (Ex. J to Ross Dep., Doc. 19-11, at 45.)  Mr. McDaniel disagreed that the discipline was "too harsh", stating:

> While I agree wholeheartedly that you are a dedicated and valuable employee and have a track record of high performance, this disciplinary action is appropriate relative to the offense and other discipline given to supervisory personnel.  As a leader in this organization, adherence to the city's policies are paramount.  Not only is this a violation of the city's policy, but the appearance of the misuse of a city vehicle in a paid status to the public can significantly erode their trust and confidence in our collective team.  It obviously sets a bad example for our employees as well.  I know this will quickly be put behind us and that your professionalism will continue to prevail in the future.

(*Id.* at 46.)  Mr. Ross did not discuss race with Mr. McDaniel during his appeal, and he did not appeal Mr. McDaniel's findings.  (Harding Dep., Doc. 19-4, at 57-58.)  Mr. Ross also admitted that taking Luke Browning to his home to look at his pool was inappropriate, and he admitted to telling Mr. Burns during the investigation that he did not take Luke Browning to his house to "work on" his pool.  (Ross Dep. at 78, 81.)

*4.  Post-Discipline Allegations and Plaintiff's Resignation*

Around lunchtime on January 31, 2014, Mr. Ross was getting ready to leave the office. Mr. Grubaugh walked in and asked Mr. Ross: "where are you going, to get you some chicken?" (Ross Decl. at ¶ 37; Lozier Aff't, Doc. 19-3, at ¶ 5.)

Ms. Beth Lozier witnessed this remark and indicated that Mr. Grubaugh had just come back from a dentist appointment, such that his mouth was numb and he did not speak normally. (Lozier Aff't, Doc. 19-3 at ¶ 4.) Ms. Lozier was nonetheless surprised by Mr. Grubaugh's use of the word "chicken," and she asked him to explain what he meant. (Lozier Aff't, Doc. 19-3 at ¶ 6.) Mr. Grubaugh responded that he was asking about food because he wanted lunch. (Lozier Aff't, Doc. 19-3 at ¶ 7.)

On February 4, 2014, Mr. Ross wrote an email to then-Human Resources Director Tim Wagner, stating that, "being through what I've gone through here, (being referred to as a monkey, or nigger or the infamous yard-ape)", he was "deeply offended" by Mr. Grubaugh's comment. (Ex. R to Ross Dep., Doc. 19-11, at 66.) He wondered, "when do we say as a group seeking to change old hearts and minds, that enough is enough, and this will not be tolerated here? Are we supposed to accept this as still being the norm?" (*Id.*) He stressed that he was "open to meeting with [Mr. Wagner] any day and any time. Someone famous once stated that if you don't remember the past, you are doomed to repeat it. I pray that we as a City can get a grip on this, because my past here is not something that I'm willing to repeat, nor should I have to." (*Id.*) Streets and Utilities had had past issues with racist comments, including relating to food groups. (Miglietti Dep., Doc. 19-5, at 72.) Mr. Wagner responded that he understood Dublin's past, which he did not want to repeat, and assured Mr. Ross that they would "be diligent in investigating[.]" (Ex. Y to 30(b)(6) Dep., Doc. 19-8, at 101.)

7

Following Mr. Ross's letter, Mr. Wagner met with Ms. Lozier and Mr. Grubaugh, and then asked Mr. Grubaugh to be sensitive to other people's perceptions. (Miglietti Dep. at 70.) Mr. Wagner did not interview Mr. Ross. (Ross Dep. at 16-17.)

Mr. Ross resigned by letter on February 24, 2014. (*Id.* at 59.) His letter stated that he still did not feel that the City was addressing his "concerns on racial issues[.]" (30(b)(6) Dep. Ex. Z, Doc. 19-8, at 103.) The City accepted his resignation the same day. (Doc. 29-10.) When asked why he quit, Mr. Ross replied that he had no choice. (Ross Dep. at 15-16; Ross Decl. at ¶ 43.) He had been:

> asking for investigations into racist remarks, racist jokes, and there was no, I mean, from the time I started there in 2002 from being called a nigger to a yard ape, hearing people scream at one of the other African-Americans 'There's watermelons over here' over the radio, over city-wide radio.
>
> Leading up to the gentleman that got suspended and brought back and two of them were put on my crew to where I was threatened at home, my life I believe was threatened at home with an anonymous letter in the mail, no investigation into that. And even the last incident that happened with Bill Grubaugh …asking me 'Where are you going? To get you some chicken?' and reported it to HR because I was totally offended by it.
>
> And to the point of the day that I sent in the resignation letter I had not been questioned about it. I had asked other supervisors that were in the room, Clint Hudson, Jeff Stallings, had they been questioned on it, they both implied no, which to me meant that they didn't take the complaint seriously at all and the effect it had on me. I mean, it was a buildup of all that.

(Ross Dep. at 16-17.)

When asked whether Mr. Ross "really want[ed] to quit" or whether he was "hoping that Dublin would change their ways and ask [him] to stay", Ross responded that he "was hoping to move them forward with an investigation of what was happening." (*Id.* at 17.)

### 5. *Jeff Stallings and Gary David Browning*

Jeff Stallings and Gary David Browning were white Crew Supervisors. The City received allegations that Jeff Stallings misused a City vehicle during work time to get breakfast for a female front desk employee. (Ross Dep. at 11; Burns Dep. at 106-108.)[2] In investigating the allegations, the City interviewed front desk workers and others, and reviewed video-tape footage from the front desk area. (Burns Dep. at 106-09.) This investigation yielded nothing, (*id.*), yet on July 12, 2012, the City gave Mr. Stallings a written counseling to warn him about inappropriate fraternizing at the front desk. (Ross Dep. at 11; Burns Dep. at 105-110.)

Regarding Mr. G.D. Browning, the City received an inquiry from Channel 10 News following the news channel's investigation into Mr. Browning's misuse of a City vehicle. (Miglietti Dep. at 9-10.) After receiving this inquiry, the City investigated by analyzing GPS data and interviewing Mr. G.D. Browning. (*Id.* at 10-13.) During the investigation, Mr. Browning immediately admitted to exceeding the scope of his permission to use the City vehicle and to exceeding the speed limit. (*Id.* at 12-13.) He explained that, while he had permission to take the City vehicle home, he did not have permission to detour. (*Id.* at 14.) He had detoured twice to the car mechanic, where his car was in for repairs. (*Id.* at 13.) For these actions, Mr. G.D. Browning was suspended for one day without pay. (Notice of Pre-Disciplinary Conference, Doc. 29-7, at 2-3.) Following this incident, the City reviewed the City policy on authorized use of City vehicles with Crew Supervisors and managers. (Miglietti Dep. at 15.)

### 6. *City Policies on Discipline, Discrimination, and Harassment*

The City has two types of policies: Codified Orders and Administrative Orders. Both types of orders address discrimination, harassment, and discipline at the City. Codified Order

---

[2] Mr. Stallings had been previously suspended for five days for sexual harassment. (Ross Dep. at 29-30.)

33.09 and Administrative Order 2.66[3] prohibit discrimination that affects the terms and conditions of employment.  (Harding Dep. at 30; Exs. to 30(b)(6) F and G, Doc. 19-8, at 40-42, 49-50.)  Codified Order 33.69 prohibits disrespectful conduct and harassment more generally, and contains provisions for how the City disciplines violations of City Codified Orders.  (Ex. to 30(b)(6) F, Doc. 19-8, at 45-47.)  Administrative Order 2.49 also prohibits disrespectful conduct and harassment.  (30(b)(6) Dep Ex. H, Doc. 19-8, at 51-52.)  To a certain extent, the City's policies on discrimination and harassment overlap.  (Harding Dep. at 50.)

The City's policy related to discipline allows, but does not require, progressive discipline. (30(b)(6) Ex. F, Doc. 19-8, at 45-47.)  The City uses progressive discipline to handle minor violations.  (Harding Dep. at 38.)  For more serious violations, like a supervisor abusing its supervisory authority, the City would conduct a partial investigation to verify facts before levying any accusations.  (*Id.* at 43-45.)  The City policies provide for discipline "appropriate to

---

[3] Administrative Order 2.66 was implemented in 2002, and provides that:

> It is the policy of the City of Dublin to maintain a professional, businesslike work environment free from all forms of unlawful discrimination.  Employees of the City of Dublin are hereby advised that discrimination on the basis of age, race, color, sex, national origin, ancestry, pregnancy, religion, disability, marital status, or veteran's status, is a violation of Federal and/or State Law and is strictly prohibited.  Such forms of discrimination shall not be tolerated and shall result in severe disciplinary action up to and including dismissal.  Rigorous and strict enforcement of this policy is expected at all managerial/supervisory levels in an effort to maintain a workplace free of such discrimination.

(30(b)(6) Dep. Ex. G, Doc. 19-8, at 49.)  The Administrative Order defines "Discrimination" as "Any Conduct, behavior, action, or decision with respect to hiring, promotions, compensation, terms, conditions, or privileges of employment on the basis of an individual's age, race, color, religion, sex, national origin, ancestry, pregnancy, disability, marital status, or veteran's status. (*Id.*)  The Order encourages employees who feel they have experienced unlawful discrimination to report such conduct. (*Id.* at 50.)  If a report is made,

> [A]n investigation into the alleged conduct shall be completed in a prompt manner, with a full written report being made to the Director of Human Resources recommending the appropriate action to be taken.  Until which time the investigation is completed and the recommendations in the written report are implemented, the identities of the directly involved parties shall be kept as confidential as is reasonable under the circumstances.  Following closure of the investigation, the investigation results shall be disclosed directly to the affected parties.  (*Id.*)

the nature of the offense." (*Id.* at 16.)  If the City cannot prove an allegation sufficiently, it may find a lower level of discipline to be appropriate. (*Id.* at 17.)  The seriousness of the offense is the most important factor to the City in doling out discipline. (*Id.* at 40.)

### 7. The City's Handling of Discrimination Complaints

To HR Director Harding's knowledge, Dublin has not investigated a single complaint under the discrimination Administrative Order 2.66. (Harding Dep. at 4, 77).[4]  Counsel conceded as much at oral argument.  The City did receive complaints of discrimination, however, from at least three sources: Michael Cave, Mr. Ross, and Crew Supervisor Mike Riley. (30(b)(6) Ex. L, Doc. 19-8, at 60; Ross Decl. at ¶¶ 6, 10.)

Michael Cave complained to the City in 2008. (30(b)(6) Dep. Exs. Q and R, Doc. 19-8, at 80-87.)  Mr. Cave, a new employee, was "fed up with ongoing passive aggressive racism[,]" and was so upset by the "ongoing subtle racial harassment" that he "needed to go home[.]"  He complained that his co-workers told him that he was only hired because he was black and that the City needed to run the organization like a plantation.  He also complained that they hid his personal protective equipment, spit tobacco in his Gatorade bottle, damaged his lunch, and rigged the lawn equipment to make it spray gas on him. (Miglietti Dep. at 18-60.)  He expressed concerns with how his crew was treating him, and with racism within the City generally. (*Id.* at 23.)  Mr. Burns met with Mr. Cave in mid-June 2008 and explained to him that the City was implementing Cultural and Diversity training. (*Id.* at 25; 30(b)(6) Dep. Ex. P, Doc. 19-8, at 69-79.)

Dublin investigated Mr. Cave's complaints not under the discrimination Administrative Order 2.66, but under a different Administrative Order regarding Disrespectful, Malicious, Abusive Conduct. (30(b)(6) Dep. Ex. U, Doc. 19-8, at 92-96.)  Following its investigation,

---

[4] Mr. Harding was also "not familiar" with the term "implicit bias."  (Harding Dep. at 73.)

Dublin found "[t]hat while some of the things that he complained about may or may not have happened, they weren't necessarily happening because of his race. They were happening because, if they happened, because unfortunately that was part of the culture at the time in the department: such as picking up empty containers to spit in." (Miglietti Dep. at 49-50.) Dublin found "no reasonable basis to believe that Mr. Cave was subject to disrespectful or racially inappropriate conduct/behavior by the members of his crew." (30(b)(6) Dep. Ex. U, Doc. 19-8, at 96.)

Mr. Ross also complained about his discipline. In seeking to appeal his ten-day suspension in July 2012, Mr. Ross found the suspension to be "extreme and discriminatory, seeing as we have members of this management team that have done seemingly far worse and have received a far less action." (Ross Decl., ¶¶ 28, 33; Email, Doc. 29-9, at 3.) Dublin treated Mr. Ross's complaint as one of harsh treatment compared with other management team members rather than one of racial discrimination. (Harding Dep. at 52-53, 58-59.) Dublin did not consider Mr. Ross's complaint under its discrimination policy. (*Id.* at 60-61.)

Also in July 2012, Crew Supervisor Mark Riley complained about race discrimination. He emailed the City Manager Marsha Grigsby, forwarding an email from Mr. Ross and expressing concern about the racially hostile environment within Dublin's Streets and Utilities Department. (30(b)(6) Dep. Ex. L, Doc. 19-8, at 59-60.) Ms. Grigsby did not respond to Ross or Riley, but she did forward the email to Mr. Harding. (Harding Dep. at 83.) Mr. Harding noted that these allegations came from employees with an "ax to grind with the City because they were both involved in disciplinary investigation." (*Id.* at 88.) He also noted that Mr. Riley filed a complaint in 2010 with the Equal Employment Opportunity Commission ("EEOC") alleging that Dublin had a racially hostile work environment. (*Id.*) Because the EEOC had vetted Mr. Riley's

12

claim in 2010 and had dismissed the case, Dublin did not respond to the complaint.  (*Id.* at 84, 88.)

Mr. Riley made a second complaint in December 2013, alerting the City to discrimination experienced by his African-American subordinate Alonzo Smith, who had just resigned. (Miglietti Dep. at 61-66; 30(b)(6) Dep. Exs. V and W, Doc. 19-8, at 97-99.)  Because Mr. Smith "wanted no part of an investigation[,]" the City did not investigate Mr. Smith's allegations further.  (Miglietti Dep. at 65.)

As discussed in detail *supra* in section (1)(A)(4), Mr. Ross also complained to the City about Mr. Grubaugh's "chicken" comment.   The City's response was brief questioning and asking Mr. Grubaugh to be sensitive to peoples' perceptions.  (Miglietti Dep. at 70.)

### B.  Procedural History

Plaintiff brought a two-count complaint in the Franklin County Court of Common Pleas, alleging: (1) employment discrimination based on race, in violation of 42 U.S.C. § 2000e-2 ("Title VII"), 42 U.S.C. § 1981, and Ohio Revised Code § 4112.02(A); and (2) constructive discharge.  (Doc. 1.)[5]  Defendant removed the case to federal court and filed a motion for summary judgment.  (Doc. 19.)  In responding (Doc. 26) and in amending its response (Doc. 29)[6] to Defendant's motion for summary judgment, Plaintiff relied upon a declaration from Mr. Ross. (Doc. 27.)  Defendant moved to strike Mr. Ross's declaration, in its entirety or in certain sections, (Doc. 30), and Plaintiff moved for leave to amend his declaration.  (Doc. 32.)  Each of the motions is fully briefed and is ripe for review.

---

[5] Plaintiff's complaint also mentions a hostile work environment, (Doc. 1 at ¶ 1), but Plaintiff does not allege a standalone "hostile work environment" claim.  Instead, he folds these allegations into his constructive discharge claim.

[6] Mr. Ross sought leave of Court to amend his response, which Defendant did not oppose.  (Doc. 28.) The Court will address this motion as well.  (*Infra*, section (III)(A).)

13

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). The mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment. *See Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir. 1992). Summary judgment is inappropriate, however, "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251-52). In evaluating such a motion, the Court must view the evidence in the light most favorable to the nonmoving party, and must draw all reasonable inferences in the non-moving party's favor. *United States Sec. & Exch. Comm'n v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson,* 477 U.S. at 251; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

14

### III.    ANALYSIS

The Court will first address Mr. Ross's motions to amend and Dublin's motion to strike Mr. Ross's declaration.  The Court will then address Dublin's motion for summary judgment on Mr. Ross's discrimination and constructive discharge claims.

### A.  Ross's Motions to Amend

Ross filed an unopposed motion to amend/correct his opposition to Defendant's motion for summary judgment (which was untimely-filed in the first instance) in order to fix clerical and citation errors.  (Doc. 28.).  The Court **GRANTS** Ross's unopposed motion and will consider his amended response (Doc. 29) in evaluating Dublin's motion for summary judgment.

Dublin moved to strike Ross's declaration (Doc. 27) for: (a) failing to comply with the requirements of 28 U.S.C. § 1746 that the declaration be dated and certified as "true and correct"; and (b) for containing evidence inadmissible for the purposes of summary judgment.[7] (Doc. 30 at 2.)  Ross moved for leave to file a substitute/corrected declaration that complied with the requirements of 28 U.S.C § 1746 ("Motion to Amend").  (Doc. 32.)  Dublin opposed Ross's Motion to Amend, arguing: (a) Ross should have cited his sworn deposition, rather than an unsworn statement; (b) Ross did not comply with Southern District of Ohio Local Rule 7.2(d), which requires evidence in support of a motion to be submitted no later than the date of his opposition brief; and (c) the proposed amendment prejudices Dublin.  (Doc. 33 at 1, 3-5.)

The fact that Ross submitted a declaration in addition to a deposition does not, in itself, warrant striking the declaration.  *See Powell-Pickett v. A.K. Steel Corp.*, 549 F. App'x. 347, 353 (6th Cir. 2013) ("[A] party opposing summary judgment with an affidavit that contradicts her earlier deposition must explain why she disagrees with herself.").  Ross's unsworn and undated declaration, however, was defective for failing to comply with 28 U.S.C. § 1746. *Fox v. Brown*

---

[7] The Court will address the admissibility of the declaration's contents in Section (III)(B).

*Mem. Home, Inc.*, Case No. 2:09-cv-915, 2010 WL 4983153, *1 (S.D. Ohio Dec. 2, 2010) (affidavit with an electronic rather than handwritten signature violating local rules could not be considered on a motion for summary judgment).  Ross argues that, like the plaintiff in *Fox*, he should be able to amend his declaration to cure similar technical deficiencies.  (Doc. 32 at 2-3.) The Court agrees.

In opposing Ross's motion, Dublin relies on *Ward v. American Pizza Co.*, 279 F.R.D. 451, 456 (S.D. Ohio, 2012), and *Fraker v. Marysville Exempted Village Schools*, 696 F. Supp. 2d 887, 894 (S.D. Ohio, 2010).  Both are distinguishable.  The *Ward* plaintiff, although careless like Ross, sought to amend her *complaint*, a different process governed by Federal Rules of Civil Procedure 15(a) and 16(b).  *Ward*, 279 F.R.D. at 456.  The *Fraker* plaintiff sought to introduce a *supplemental* (not amended) declaration with new evidence by a new affiant.  *Fraker*, 696 F. Supp. 2d at 894.[8]  Unlike the *Fraker* defendant, Dublin is not faced with new evidence; the amended declaration contains the same substantive content as the prior, deficient version.[9] Indeed, Dublin would not be prejudiced by an amended declaration because Dublin addressed its substance in its reply brief.  (Doc. 31.)  The Court therefore **GRANTS** Ross's motion to file an amended declaration.  (Doc. 32.)

### B.  Dublin's Motion to Strike

Dublin also moved to strike certain portions of Ross's amended declaration on the grounds that it contains inadmissible: (a) hearsay; (b) statements in direct contradiction to Ross's deposition testimony; (c) "me too" evidence; and (d) allegations relating to a prior EEOC charge

---

[8] The *Fraker* plaintiff also neglected to respond to the motion to strike, and the supplemental affidavit had deficiencies such that it could not be considered an affidavit.  696 F. Supp. 2d at 894.

[9] The Court finds that paragraph 44, which adds the date the declaration was originally signed, does not constitute a substantive change.  Because the amended declaration contained the same substance as the prior version, Ross did not violate Local Rule 7.2(d).  *Fox*, 2010 WL 4983153, at *1.

for which Ross did not bring a lawsuit.  These portions are contained in paragraphs 3, 6-8, 10, 13, 23, 30, and 36.  (Doc. 30 at 9-15.)

Amendments made to Federal Rule of Civil Procedure 56 in 2010 changed the mechanism for objecting to Ross's affidavit.  *Foreword Magazine, Inc. v. OverDrive, Inc.*, No. 1:10-cv-1144, 2011 WL 5169384, at *2 (W.D. Mich. Oct. 31, 2011).  Where, before 2010, Dublin would have filed a motion to strike, there is no longer any need for such a motion.  *Id.* Instead, the Court will treat Dublin's motion to strike as an objection under Federal Rule of Civil Procedure 56(c)(2), which provides: "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  The Court will disregard only the inadmissible portions of Ross's affidavit.  *See Roshen v. Int'l Business, Machines Corp.*, no. 2:14-cv-260, 2016 WL 950363, at *8 (S.D. Ohio March 14, 2016).

*1.  Hearsay*

The Court must disregard hearsay evidence submitted in opposition to a motion for summary judgment.  *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007).  Dublin argues that paragraphs 3 and 30 contain hearsay.  (Doc. 30 at 9-10, 13-14.)  Ross admits as much for paragraph 30, (Doc. 34 at 7), and the Court will disregard it.  Ross argues that paragraph 3, however, which contains a statement from Tina Jones that the City's Streets & Utilities Department was a "good 'ole boy type of place," was not asserted for its truth, but rather for its status as a *warning* to Mr. Ross.  (*Id.* at 3.)  Ross found, in his *own* experience, that the Department was a "good 'ole boy type of place."  (*See* Ross Am. Decl., at ¶ 3.)  The Court finds that Ross used Ms. Jones' statement to show its effect on Mr. Ross, rather than for its truth.  As such, Dublin's objection to Ms. Jones' statement in paragraph 3 is **OVERRULED.**

17

*2.  Statements Contradictory of Mr. Ross's Deposition*

A nonmoving party cannot defeat a motion for summary judgment "simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999).  In deciding the admissibility of a post-deposition affidavit at the summary judgment stage, a district court "must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony." *Aerel, S.R.L v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006).  If so, the affidavit should be stricken "unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Id.*  If there is no direct contradiction, the district court "should not strike or disregard that affidavit unless the court determines that the affidavit 'constitutes an attempt to create a sham fact issue.'" *Id.* (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).  In *Aerel*, the Sixth Circuit adopted three non-exhaustive factors, originally set forth by the Tenth Circuit in *Franks*, for courts to consider in determining whether the nonmoving party has attempted to use the affidavit to create a sham fact issue:

> [W]hether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion [that] the affidavit attempts to explain.

*Id.* at 909 (quoting *Franks*, 796 F.2d at 1237) (alteration in original).

Dublin contends that paragraphs 3, 6, 10, 13, 23, and 36 directly contradict Ross's deposition testimony, or at least raise a sham issue of fact under *Aerel*.  (Doc. 30 at 9-15.)  Ross argues that the statements do not directly contradict his deposition testimony, and he makes no argument on the *Aerel* factors.  (Doc. 34 at 2-6.)  Ross agrees that portions of paragraphs 10 and

18

36 contradict his deposition testimony (Doc. 34 at 6-7); as such, the Court will not consider the

text in paragraph 10, "without a shirt and in his stocking feet"; or paragraph 36, "while using an

offensive, stereotypical shuck and jive dialect and racially mocking mannerism." (*Id.*)

The Court declines Dublin's invitation to disregard the statements made in paragraphs 3,

6, 10, 13, and 23 on the basis that they contradict his deposition testimony.  In paragraph 3, Tina

Jones' "'good 'ole boy' type of place" statement does not directly contradict Mr. Ross's

testimony.  He did not use that statement as evidence "which caused him to believe that he was

being discriminated against" during his employment with the City (Doc. 30 at 9); rather, the

statement was made *before* he was employed with the City.  He also testified, following a single

question in his deposition about who interviewed him, that he was interviewed by Danny

Johnson, Bill Grubaugh, and others, whose names he did not remember at the time.  (Ross Dep.

at 25.)  The City did not follow up with this line of questioning at Mr. Ross's deposition.  (*Id.*)

Because of the sparse questioning at his deposition, the statement does not create a sham issue of

fact under *Aerel*.

In Paragraph 6, Dublin objects to the language "Mr. Dellenbach did not react to the term

and I assumed that he and Mr. McCoy probably used that term on a regular basis." (Doc. 30 at

10.)  Mr. Dellenbach's blank face is not a racial slur that Mr. Ross asserts was made by a City

employee; thus, the statement does not directly contradict Ross's prior deposition testimony.  Mr.

Ross was also not cross-examined on the particulars surrounding Mr. McCoy's racial slur;

therefore, the statement in paragraph 6 does not create a sham issue of fact under *Aerel*.

Paragraph 10, relating to the last day and termination of Michael Cave, directly

contradicts Mr. Ross's deposition testimony to the extent that it states "without a shirt and in his

stocking feet".  The Court will not consider that portion of paragraph 10.  The remainder of the

19

paragraph does not, however, nor does it create a sham issue of fact.  Paragraph 10 depicts Mr. Ross's feelings upon watching Mr. Cave's termination.  During the deposition, Dublin did not request that Mr. Ross expound on his feelings about Mr. Cave's termination.[10]

Mr. Ross states in paragraph 13 that he "did not make it habit to leave [keys, medicine, or wallet] at home[.]"  Dublin argues that this statement contradicts deposition testimony that these things happened "once every couple of weeks."  (Doc. 30 at 12; Ross Dep. at 88, 78-80.)  The statements are not directly contradictory; according to the deposition, nine times in ten, Mr. Ross did not leave things at home.  This is consistent with not making it a "habit" of leaving things at home.  In any event, the testimony is irrelevant because Dublin dismissed its disciplinary charges on the basis of Mr. Ross using the City vehicle to pick up things he had forgotten at home.  (Ex. J to Ross Dep., Doc. 19-11, at 44.)

In paragraph 23 of his declaration, Mr. Ross states that he "denied taking an employee home to 'work' on his pool because it was simply not true."  Dublin argues that this contradicts his deposition testimony, which indicates that he made the denial because of the tone of the question.  (Doc. 30 at 12.)  The parties quibble over the word "work."  Plaintiff argues that the employee "volunteered" to go to his house; therefore, his "no" responses to questions about taking an employee home to work on his pool, were not lies.  Dublin retorts that Ross should have answered "yes" to these questions, which were not geared to such a narrow interpretation of the word "work."  The Court will allow the declaration statement in paragraph 23.  Mr. Ross's declaration mirrors his deposition in stating that he denied taking Mr. Browning home to "work" on his pool, because no work was involved.

---

[10] The Court also finds that Paragraph 10 does not constitute "me too" evidence from Mr. Cave, because it depicts *Mr. Ross's* perception of Mr. Cave's termination.  (Doc. 30 at 7.)

In sum, the Court will disregard portions of paragraphs 10 ("without a shirt and in his stocking feet") and 36 ("while using an offensive, stereotypical shuck and jive dialect and racially mocking mannerism") because they directly contradict Mr. Ross's deposition. The Court will not disregard the other disputed statements made in paragraphs 3 ("During one of my final employment interviews, in 2002, a Human Resources representative, Tina Jones, warned me that the Streets and Utilities Department was a 'good 'ole boy' type of place."), 6 ("Mr. Dellenbach did not react to the term and I assumed that he and Mr. McCoy probably used that term on a regular basis"), 10 ("I was present on August 22, 2008 when Defendant City terminated Michael Cave and made him return all of his City-issued equipment and clothing – including his shirt and boots. I watched Defendant City march Mr. Cave out of the S & U building…. Defendant City treated Mr. Cave as if he were a thief and in an unnecessary and horribly demeaning manner. I witnessed Defendant City terminate white employees, and they were not treated in the same manner. I believe Defendant City's treatment of Mr. Cave was because he is African American and I felt powerless to object."), 13 ("did not make it habit to leave such items at home"), and 23 ("I denied taking an employee home to 'work' on his pool because it was simply not true").

### 3. Statements Related to 2003 EEOC Charge

Dublin contends that any statements relating to prior EEOC charges are inadmissible, because they are based on time-barred prior charges for which no complaint was ever filed. (Doc. 30 at 8.) This argument encompasses paragraphs 6-8 of Ross's declaration. (Doc. 30 at 11.)

Ross uses statements relating to prior EEOC charges solely for the purpose of his constructive discharge/hostile work environment claim. Hostile work environment claims differ in kind from discrete claims of discrimination. *National R.R. Passenger Corp. v. Morgan*, 536

21

U.S. 101, 116–17 (2002).  Where a claim of discrimination is based on discrete actions, "[a]

hostile work environment claim is composed of a series of separate acts that collectively

constitute one 'unlawful employment practice.' 42 U.S.C. § 2000e–5(e)(1)."  *Id.* at 117.  Because

"[s]ubsequent events…may still be part of the one hostile work environment claim and a charge

may be filed at a later date and still encompass the whole[,]" Mr. Ross's allegations related to the

prior EEOC charges are not inadmissible as untimely.  *Id.*

### 4. *Exhibits Unattached to Affidavit*

Dublin also "brings the Court's attention" to the exhibits attached to Ross's opposition

brief, which were not attached to an affidavit.  (Doc. 30 at 5 n.3)  Before the 2010 amendments

to Federal Rule of Civil Procedure ("FRCP") 56, attaching unauthenticated exhibits would

indeed have posed a problem.  *Swank v. Hale*, No. 2:12-cv-1031, 2016 WL 1156517, at *2 (S.D.

Ohio Mar. 24, 2016).  The 2010 FRCP amendments, however, replaced the bright-line rule of

former FRCP 56(e)[11] with a more flexible framework designed to bring pretrial procedure closer

in line with objections at trial.  *Foreword Magazine, Inc. v. OverDrive, Inc.*, No. 1:10-cv-1144,

2011 WL 5169384, at *2 (W.D. Mich. Oct. 31, 2011) (citing Advisory Committee comments to

the 2010 amendments).  Under the new framework, Ross need only "cit[e] to particular parts of

materials in the record, including depositions, documents, electronically stored information,

affidavits or declarations, stipulations[,] … admissions, interrogatory answers, or other

materials[.]"  Fed. R. Civ. P. 56(c)(1)(A).  Dublin may then "object that the material cited …

cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).

This objection is not simply that the material cited "'has not' been submitted in admissible form,

but that it 'cannot' be."  *Foreward Magazine*, 2011 WL 5169384, at *2.  Dublin has not made an

---

[11] Before 2010, FRCP 56(e) provided: "If a paper or part of a paper is referred to in an affidavit, a sworn
or certified copy must be attached to or served with the affidavit."  Fed. R. Civ. P. 56(e)(1).

objection that Ross's exhibits "cannot" be submitted in admissible form by "bring[ing] to the Court's attention" the fact that Ross's exhibits are not attached to an affidavit.  Therefore, the Court will not strike all of Ross's exhibits on the grounds that they are not attached to an affidavit.

### C.  Discrimination Claims

Title VII prohibits an employer from discriminating against any individual based on that individual's race or other protected characteristic.  *See* 42 U.S.C. § 2000e-2(a)(1); *Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 955 (6th Cir. 2014).  A plaintiff may prove disparate treatment on the basis of race in two ways: direct evidence of discrimination, or circumstantial evidence that creates an inference of discrimination.  *Id.*  The Court analyzes discrimination claims under 42 U.S.C. § 1981 and § 4112 of the Ohio Revised Code using the same analytical framework as Title VII discrimination claims.  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992); *Carter v. Univ. of Toledo*, 349 F.3d 269, 272 (6th Cir. 2003).  Here, Ross has not introduced direct evidence of disparate treatment or harassment on the basis of race.  Therefore, the Court applies the burden-shifting framework for circumstantial evidence established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  First, Plaintiff must make a prima facie case of discrimination by showing that: (1) he was a member of a protected class; (2) he was subject to an adverse employment action; (3) he was qualified for the job; and (4) for the same or similar conduct, he was treated differently from similarly situated employees outside the protected class.  *See id.* at 802; *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000).

If a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Brathwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001).  This explanation must be "legally sufficient to justify a judgment for the defendant."  *Wright v. Murray Guard, Inc.*, 455 F.3d 702,

706 (6th Cir. 2006) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1995)).

   After the defendant meets its burden, the plaintiff must then demonstrate that the defendant's explanation was a pretext for discrimination. *Id.* at 707. The burden to show pretext requires a plaintiff only "to rebut, but not to disprove, the defendant's proffered rationale." *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012) (internal quotation marks and citation omitted). A plaintiff may demonstrate pretext by showing that the proffered nondiscriminatory reasons had no basis in fact, did not actually motivate the action taken, or were insufficient to explain the adverse action. *Harris v. Metro. Gov't of Nasvhille & Davidson Cnty., Tenn.*, 594 F.3d 476, 486 (6th Cir. 2010); *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 586 (6th Cir. 2009). Plaintiff bears the ultimate burden of persuasion to prove by a preponderance of the evidence that race was the "but-for" cause of her termination. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009).

### 1. Prima Facie Case

   Dublin does not dispute that Ross meets the first three elements of the prima facie case of discrimination: he is African-American; he was suspended for ten days; and he was qualified for the Crew Supervisor position he held. Dublin argues that Ross cannot meet the fourth element of the prima facie case because he "cannot establish that he was treated differently than similarly situated, non-protected employees." (Doc. 19 at 19.) Employees are similarly situated when they are similar "in all relevant respects." *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 753 (6th Cir. 2008). This standard does not require "exact correlation." *Id.* It does, however, require the plaintiff to "demonstrate that he or she is similarly-situated to the non-protected employee in all *relevant* respects." *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998)). The

comparators must "have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).  In determining whether two employees are similarly situated "in all relevant respects," the Court's task is to "make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee."  *Louzon v. Ford Motor Co.*, 718 F.3d 556, 563-64 (6th Cir. 2013).

Ross points to white Crew Supervisors Jeff Stallings and Gary David Browning who were also disciplined for use of a City vehicle for personal reasons, as similarly situated."[12] (Doc. 29 at 15-18.)  Dublin disputes that Stallings and G.D. Browning are similarly situated.

### a.  Jeff Stallings

The City disciplined Jeff Stallings, a white Crew Supervisor, with a written counseling, following allegations that he misused his City vehicle to buy breakfast for women working at the front desk.  Dublin contends that it investigated, but was unable to substantiate, rumors surrounding Stallings spending too much time socializing with women at the front desk and using a City vehicle to bring them breakfast.  (Doc. 31 at 8-9.)  Dublin's inability to substantiate the rumors led to it disciplining Stallings with a counseling.  (Doc. 19 at 12-13; Doc. 31 at 8.)

---

[12] While Dublin mentions two other potential comparators, Ms. Lozier and Mr. Babyak, Ross did not present any argument in support of their suitability as comparators.  The Court will therefore not consider them.  *Graham v. Am. Cyanamid Co.*, 350 F.3d 496, 506 (6th Cir. 2003); *Clark v. City of Dublin, Ohio*, 178 F. App'x 522, 524-25 (6th Cir. 2006).  *See also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute.").

Dublin's inability to substantiate these rumors also forms the basis for the City's argument that Mr. Stallings is not similarly situated to Mr. Ross.  (Doc. 31 at 8-9.)[13]

Dublin, however, did not investigate Mr. Stallings with the same vigor as it did Mr. Ross. (Doc. 29 at 16.)  To investigate Ross, whose disciplinary record was clean, Dublin enlisted Ross's subordinate (Luke Browning) and his supervisor (John Babyak) to photograph the City vehicle at Ross's residence over a four-to-six week period.  (*Id.*)  To investigate Stallings, who Dublin had previously suspended for five days for sexual harassment, (Doc. 19 at 12 n.8), Dublin simply interviewed a few people, including the women at the front desk, and reviewed video footage.  (*Id.* at 22.)  Dublin did not enlist the front desk workers or anyone else in an investigation against Stallings.  (*See id.*)  Mr. Stallings received a written counseling because Dublin was unable to substantiate the allegations against him.  (*Id.* at 12-13.)  If Dublin had investigated Ross less vigorously, then perhaps Ross, too, would have walked away with a written counseling.

The Court finds Mr. Ross to have met his prima facie case based on a comparison of Dublin's investigation of Stallings and Ross.  A reasonable juror could find that "Defendant City did not give Mr. Ross the same benefit of the doubt that it gave to Mr. Stallings in providing him with the counseling memorandum informing him that if true, his conduct violated city policy; affording him the opportunity to correct the alleged infraction without incurring another negative mark on his disciplinary record."  (Doc. 29 at 5.)

---

[13] Dublin cites *Davis v. Landscape Forms, Inc.*, 640 F. App'x. 445, 454 (6th Cir. 2016) and *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998) to argue that the City's investigation need not have been perfect.  These cases relate to an employer's investigation *of the plaintiff*, however, not of a potential comparator.

*b.  Gary David Browning*

Dublin disciplined white Crew Supervisor Gary David Browning with a one-day suspension following an investigation by WBNS-TV into Browning's misuse of a City vehicle at least twice to run personal errands.  (Doc. 19 at 22-23.)  Dublin justifies its differential treatment of G.D. Browning by arguing that G.D. Browning "did not lie during the investigation[,]" that he "did not involve subordinate employees or otherwise abuse his supervisory authority[,]" and he "was not on City time."  (*Id.* at 22; Doc. 31 at 9-10.)  Dublin points out that G.D. Browning had permission to drive the City vehicle home after hours; he simply detoured to the car mechanic on his way there, and that G.D. Browning "violated *one* work rule while Mr. Ross violated *several* and then lied about it."  (Doc. 31 at 9-10; Doc. 19 at 22-23) (emphasis in original.)

Although it is undisputed that Mr. Ross involved a subordinate while G.D. Browning did not, and Mr. Ross used the City vehicle during the work day whereas G.D. Browning did not, Ross disagrees with the remaining distinguishing features.  Citing his declaration, Ross implies that he too had permission to go home because he alerted his supervisor John Babyak each time,[14] and "Babyak never instructed him to clock out or use his personal vehicle."  (Doc. 29 at 18; Ross Decl. at ¶ 13.)[15]  He asserts that Luke Browning volunteered to answer a question about Ross's pool, and that "no one engaged in work of any kind."  (Doc. 29 at 18; Ross Decl. at ¶ 23.) He admitted to stopping for fencing on the way back to the office, believing this to be permissible *de minimus* use of the vehicle.  (Doc. 29 at 18; Ross Decl. at 14.)  He believes he did not lie; rather, he "answered all of the City's questions about each of these allegations directly and forthrightly."  (Doc. 29 at 18; Ross Decl. at ¶ 22.)  Ron Burns had simply decided to

---

[14] Ross admits during oral argument that he did not receive permission to take Luke Browning to his home to look at his pool.

[15] Dublin does not contest this evidence as inadmissible.  (*See* Doc. 30.)

disbelieve Ross in favor of Luke Browning, a white employee who had reason to lie because Ross had reported him for misusing sick leave.  (Doc. 29 at 18.)

Viewing the evidence in the light most favorable to Ross, as the Court must, the Court finds that material facts remain regarding whether Mr. G.D. Browning is "similarly situated" to Mr. Ross in all relevant respects.  *See, e.g.*, *McMillan v. Castro*, 405 F.3d 405, 412 (6th Cir. 2005) (jury made "similarly situated" decision).  G.D. Browning was a white Crew Supervisor disciplined with a one-day suspension after he was proved to have misused a City vehicle.  (Doc. 19 at 22-23.)  Mr. Ross was an African-American Crew Supervisor disciplined by a ten-day suspension after he was proved to have misused a City vehicle.  Although Dublin challenged the admissibility of Mr. Ross's declaration, including, as relevant here, paragraphs 13 and 23, the Court has found these paragraphs to be admissible in evidence.  The evidence thus shows the following genuine issues of material fact: whether (a) Mr. Ross lied during the investigation; (b) had permission to use the City vehicle for two of the three recorded incidents; and (c) abused his supervisory authority by involving a subordinate employee who actively volunteered to look at his pool.  A reasonable jury could resolve these questions in Mr. Ross's favor and disregard the time of day of the vehicles' misuse as irrelevant.  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) ("The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated[.]'")  The Court therefore declines, on summary judgment, to eliminate G.D. Browning as a potential comparator.

### 2.  Pretext

Defendant's proffered non-discriminatory reason for disciplining Ross with a 10-day suspension is that "he misused a City vehicle on multiple occasions, abused his supervisory authority, stole City time, and was dishonest during the investigation into his conduct."  (Doc. 31

28

at 11.)  Dublin explains that Ross's "misuse" of the city vehicle relates not to "going home to

retrieve things he forgot[,]" (Doc. 31 at 7), but rather to Ross's taking a subordinate "outside

City limits in a City vehicle during City time" to (a) purchase fencing for his personal use and (b)

diagnose a problem with his personal pool.  (*Id.*)  Dublin has therefore set forth non-

discriminatory reasons, supported by admissible evidence, for disciplining Ross "which, *if

believed by the trier of fact*, would support a finding that unlawful discrimination was not the

cause of the employment action."  *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir.

2006) (internal quotations omitted).

 The burden thus shifts back to Plaintiff to show that this explanation is pretext for

discrimination.  A plaintiff may demonstrate pretext by showing that the proffered

nondiscriminatory reason had no basis in fact, did not actually motivate the employer's action, or

was insufficient to motivate the adverse action.  *Harris v. Metro. Gov't of Nasvhille & Davidson

Cnty., Tenn.*, 594 F.3d 476, 486 (6th Cir. 2010).  The burden to show pretext requires a plaintiff

only "to rebut, but not to disprove, the defendant's proffered rationale."  *Griffin v. Finkbeiner*,

689 F.3d 584, 593 (6th Cir. 2012) (quotation marks and citation omitted).  The Sixth Circuit has

said that "[t]he three-part test need not be applied rigidly.  Rather, pretext is a commonsense

inquiry: did the employer fire the employee for the stated reason or not?"  *Blizzard v. Marion

Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (internal quotation marks, citation, and alterations

omitted).  On the other hand, there must be a basis "*in the evidence*" for rejecting an employer's

explanation.  *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 586 (6th Cir. 2009).  An employer with

an "honest belief in the proffered basis for the adverse employment action [which] arose from

reasonable reliance on the particularized facts before the employer when it made the decision,"

has not made a pretextual decision.  *Id.*

Plaintiff's arguments on pretext fall best into the first and third factors: that the proffered nondiscriminatory reason had no basis in fact, and that it was insufficient to motivate the adverse action.

The first factor "is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, i.e., that they are 'factually false.'" *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).  The proffered basis for disciplining Ross with a 10-day suspension is that "he misused a City vehicle on multiple occasions, abused his supervisory authority, stole City time, and was dishonest during the investigation into his conduct."  (Doc. 31 at 11.)  Ross raises factual issues regarding whether: (a) he lied during the investigation; (b) he had permission to use the City vehicle for two of the three recorded incidents; and (c) whether he abused his supervisory authority by involving a subordinate employee who actively volunteered to look at his pool.  Because Dublin disciplines primarily based on the severity of the offense, these facts are material to Ross's disciplinary decision.  A jury should decide whether they compel a conclusion that Dublin's nondiscriminatory reason was pretext.

To establish the third ground upon which a plaintiff may demonstrate pretext, that the proffered reason was insufficient to motivate the action, Plaintiff "must establish that [ ]he was treated less favorably than similarly situated, non-protected employees." *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666, 676 (6th Cir. 2008) (internal quotation omitted).  Because the amount and character of the evidence collected against Stallings and Ross was determinative of the discipline, the Court finds that Plaintiff met his burden here to show an issue of material fact, to the extent that the City did not investigate Mr. Stallings with the same vigor that it investigated Mr. Ross.  If the City had treated Stallings and Ross equally, it could

have (a) investigated Stallings by enlisting the help of other employees to catch Stallings in the act, or viewing video tapes of the front desk workers into the future; or (b) investigated Ross by interviewing witnesses rather than initiating a covert operation.[16]  Ross apparently announced his intention to go home in his morning crew leader meetings.  (Burns Dep., Doc. 19-7, at 23.)  It would not have been difficult to ask Ross's team whether he was known to go home in the City vehicle.

Based on the above analysis, the Court finds that Ross has met his burden to preclude summary judgment on his race discrimination claim.  Dublin's motion for summary judgment on Ross's race discrimination claim is, therefore, **DENIED**.

### D.  Constructive Discharge

To show that he was constructively discharged, Ross must "adduce evidence to show that 1) the employer ... deliberately created intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit."  *Cleveland v. Southern Disposal Waste Connections*, 491 F. App'x. 698, 708 (6th Cir. 2012) (internal quotation omitted).  The Court considers the employer's intent and the employee's objective feelings when evaluating a constructive discharge claim.  *Id.*  Regarding intent, Plaintiff shows an employer's intent "if the employee quitting is a foreseeable consequence of the employer's actions."  *West v. Tyson Foods, Inc*., 374 F. App'x. 624, 640 (6th Cir. 2010).  As to the employee's feelings, if the difficulty and unpleasantness of the working conditions would have caused a reasonable person in the employee's shoes to feel "compelled to resign," a constructive discharge claim lies.  *Cleveland*, 491 F. App'x. at 708.

---

[16] Ross also asserts that Dublin should have used progressive discipline with him to verbally warn him before conducting any investigation.  (Doc. 29 at 3.)  The evidence shows that the City does not have a progressive discipline policy, however, and the City routinely conducts investigations before meting out discipline.

Mr. Ross's constructive discharge claim is based on a hostile work environment.  To be actionable, an atmosphere of harassment or hostility "must be sufficiently severe or pervasive to alter the victim's employment conditions and create an abusive working environment."  *Pa. State Police v. Suders*, 542 U.S. 129, 131 (2004) (internal citations omitted).  The Court addresses the totality of the circumstances in assessing Mr. Ross's work environment, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [Mr. Ross's] work performance."  *Barrett v. Whirlpool Corp*., 556 F.3d 502, 515 (6th Cir. 2009) (internal quotation omitted).  The Court need not "limit [its] analysis to the narrow set of incidents directed at the plaintiff or occurring in the plaintiff's presence, . . . but comments or conduct of which a plaintiff had no knowledge cannot be said to have made her work environment hostile."  *Id.* (citing *Hawkins v. Anheuser-Busch, Inc*., 517 F.3d 321, 336 (6th Cir. 2008)).  Courts have found "simple teasing, … offhand comments, and isolated incidents (unless extremely serious)" to be insufficient.  *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998).  A hostile-environment constructive discharge claim requires "working conditions so intolerable that a reasonable person would have felt compelled to resign."  *Pa. State Police v. Suders*, 542 U.S. at 131 (internal citations omitted).

### 1.  Intolerable Working Conditions

Plaintiff argues that Dublin created a hostile work environment "[b]y failing to ever investigate under its own discrimination policy, over the course of twenty-six years, even one complaint of racial discrimination[.]"  (Doc. 29 at 20.)  Plaintiff points to at least seven incidents that he contends the City should have investigated under its discrimination policy: (1) Plaintiff's complaints in 2002 and 2003 regarding racial epithets spoken to or around Plaintiff; (2) Plaintiff's complaints in 2008 regarding the racially threatening letter placed in his mailbox;

(3) Michael Cave's 2008 complaints about race discrimination; (4) the City's 2008 investigations, dismissals, and reinstatements following complaints about race discrimination; (5) Mr. Ross's 2012 complaint that his ten-day suspension was "discriminatory"; (6) Mark Riley's complaints in 2012 following an email from Mr. Ross about race discrimination; (6) Mark Riley's complaints in 2013 regarding the concerns of Alonzo Smith about race discrimination; and (7) Mr. Ross's complaints regarding the allegedly racially discriminatory "chicken" comment.

Plaintiff also alleges that the City investigated his use-of-City-vehicle misconduct much more vigorously than it did white Crew Supervisor Jeff Stallings'; that the City disciplined him much more harshly than white Crew Supervisors Stallings and G.D. Browning for similar conduct; and that the City's investigation of Mr. Grubaugh's "chicken" comment was so paltry that it failed even to interview him, the victim, or two other potentially sympathetic witnesses, Mr. Stallings and Clint Hutson.

Defendant responds that it "appropriately responded to every legitimate complaint made by its employees." (Doc. 19 at 29.) It argues that its investigations of racial discrimination complaints under other policies were appropriate because the complaints did not reach the "terms and conditions" of the complainants' employment.

Dublin's discrimination policy mirrors, in relevant part, the "terms and conditions" race discrimination admonitions of Title VII.[17] Under Title VII, it is a violation of the "terms, conditions, or privileges" of employment to "create[ ] a working environment heavily charged

---

[17] Dublin's policy provides that "discrimination on the basis of…race…is a violation of Federal and/or State Law and is strictly prohibited." (30(b)(6) Dep. Ex. G.) Like Title VII, Dublin's policy prohibits discrimination "with respect to hiring, promotions, compensation, terms, conditions, or privileges of employment[.]" *Id.*; *compare* 42 USCA § 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race[.]")

with ethnic or racial discrimination." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986)

(internal quotations omitted).  Dublin's policy encourages employees who feel they have

experienced unlawful discrimination to report such conduct.  (30(b)(6) Dep. Ex. G.)  If a report is

made, the policy provides for "an investigation into the alleged conduct [to] be completed in a

prompt manner, with a full written report being made to the Director of Human Resources

recommending the appropriate action to be taken."  (*Id.*)  Despite receiving numerous complaints

of a working environment rife with racial discrimination, the City did not investigate a single

complaint under its discrimination policy.

Taken in the light most favorable to Plaintiff, a reasonable jury could find, as perceived

by a reasonable person, that Dublin deliberately created intolerable working conditions by

allowing its discrimination policy to lay dormant for 26 years despite numerous complaints about

racial discrimination.

## 2.  *Resignation*

Plaintiff argues that this hostile work environment compelled him to resign.  Dublin's

failure "to investigate or report the findings of its investigation regarding Grubaugh['s] 'chicken'

comment," Plaintiff argues, constituted the final straw that required him to resign.  (Doc. 29 at

20.)

The Sixth Circuit has laid out seven factors for the Court to use in analyzing whether a

reasonable person would feel compelled to resign:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Lindsey v. Whirlpool Corp.*, 295 F. App'x. 758, 770-71 (6th Cir. 2008) (internal quotation

omitted).  The Sixth Circuit has found that a reasonable person could feel compelled to resign

34

based on "badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation[.]"  *West v. Tyson Foods, Inc*., 374 F. App'x. 624, 640 (6th Cir. 2010). Such badgering, harassment, or humiliation could come from a coworker.  *Id.* (internal citation omitted).

Plaintiff has at least raised an issue of material fact regarding whether Defendant constructively discharged Plaintiff.  Taken in the light most favorable to Plaintiff, a reasonable jury could find that a reasonable person would resign following the City's failure to investigate under its discrimination policy *any* of the numerous complaints made about Dublin's racially-charged environment.  Even when Dublin did investigate such complaints, it did not necessarily alert or even interview the complainant.  A reasonable jury could find Ross's resignation to be a foreseeable consequence of Dublin's racially-charged environment and its inadequate or unannounced investigations into racially-animated complaints.  *See*, *e.g.*, *Logan v. Denny's, Inc*., 259 F.3d 558, 573 (6th Cir. 2001) (equating employer intent with foreseeability).

### 3.  Employer Liability

Dublin may be held liable for coworker harassment if its "response manifests indifference or unreasonableness in light of the facts the employer knew or should have known."[18]  *Mullins v. Goodyear Tire & Rubber Co*., 291 F. App'x. 744, 748 (6th Cir. 2008).  Dublin does not argue that it was unaware of the race-based complaints to Dublin alleged by Mr. Ross; it argues instead that it should not be held liable for the actions of Mr. Ross's coworkers because it conducted investigations into complaints, which, it contends, "need not be perfect."  (Doc. 19 at 27.)

The Court finds that Ross has raised issues of material fact as to whether Dublin's response to Ross's complaints, and others, manifests "indifference or unreasonableness."  A

---

[18] The Court assumes, for the purposes of argument, that Grubaugh was a coworker rather than a supervisor.  The standard for employer liability in the face of *supervisor* harassment is more lenient. *Barrett v. Whirlpool Corp*., 556 F.3d 502, 516 (6th Cir. 2009).

reasonable jury could find that Dublin's failure to interview Mr. Ross during its investigation of Mr. Grubaugh's "chicken" comment, of which Mr. Ross was the victim, manifests indifference or unreasonableness.  So too with the City's failure, in 26 years, to investigate *any* complaints under its own discrimination policy.  This case is distinguishable from *Mullins*, where the employer conducted a lengthy investigation that included interviewing the victim.  *Mullins*, 291 F. App'x. at 749.

Because material facts remain regarding whether Dublin constructively discharged Mr. Ross, the Court **DENIES** Dublin's motion for summary judgment on that claim.

## IV.    CONCLUSION

Based on the above, the Court:

**GRANTS** Ross's unopposed motion to amend his response to Dublin's motion for summary judgment (Doc. 28);

**GRANTS** Ross's motion to file an amended declaration in compliance with 28 U.S.C. § 1746 (Doc. 32);

**GRANTS in part** Dublin's motion to strike Ross's declaration (Doc. 30); and

**DENIES** Dublin's motion for summary judgment on Ross's discrimination and constructive discharge claims. (Doc. 19).

**IT IS SO ORDERED.**

　　　　　　　　　　　　　　　__ s/ Algenon L. Marbley_____
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:  December 7, 2016**